UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PETER J. BONEWITZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:14-CV-00096 |
| ) | Judge Aleta A. Trauger |
| NEWQUEST, LLC, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant, NewQuest, LLC ("NewQuest") (Docket No. 56), to which the plaintiff, Peter J. Bonewitz ("Bonewitz") has filed a Response in opposition (Docket No. 65), and NewQuest has filed a Reply (Docket No. 70). For the following reasons, the defendant's motion will be granted.

# BACKGROUND

This dispute involves purported retaliation against an employee after he raised concerns about issues that he believed could have constituted violations of the federal False Claims Act. NewQuest is a subsidiary of HealthSpring, Inc. and an indirect subsidiary of Cigna Corporation. Bonewitz is a citizen of Carmel, Indiana.[1]

---

[1] The facts are drawn from NewQuest's Statement of Undisputed Material Facts in Support of Summary Judgment (Docket No. 58), Bonewitz's Response and Statement of Controverting Facts (Docket No. 66), and NewQuest's Response to Plaintiff's Statement of Controverting Facts (Docket No. 71), as well as the exhibits and declarations filed by the parties in support of their briefs (Docket No. 56, Exs. A-J; Docket No. 65, Exs. 1-4, Attach. 1-7; Docket No. 70, Exs. A-D). The court notes that there are disputes of fact which are not material to the question of summary judgment before the court. Both parties have used their statements of facts to offer character attacks that are immaterial to the questions of law before the court and do not

1

HealthSpring is a Medicare Advantage ("MA") company which, as an alternative to traditional Medicare, contracts with the United States to offer Medicare-eligible participants healthcare and prescription drug care. MA companies code patients based on a diagnosis, and the diagnosis is used to formulate a risk score. Medicare pays MA companies a capitated rate that is adjusted based on the diagnosis and risk score of a patient. For patients with more severe conditions, Medicare pays to MAs upward adjustments due to higher capitation rates, and vice versa for patients with less severe conditions. MA plans are regularly audited by Medicare for compliance.

Bonewitz was hired by NewQuest on March 28, 2012, as a Systems Analyst/Level III Developer in the Business Intelligence unit of NewQuest's IT Department. Bonewitz claims that he was not hired to perform data warehouse development as a Level III developer, regardless of his title.[2] On June 26, 2012, at the end of Bonewitz's initial ninety-day employment period, Bonewitz's supervisor, Wayne Johnson, rated Bonewitz's quality and quantity of work as "poor." Johnson noted that Bonewitz had "not been performing at the level he was hired" and had "not been able to deliver a complete task for the work he ha[d] been assigned." (Docket Nos. 56-1 at pp. 117-18; 56-3 at ¶ 5, Ex. 1.) Johnson also stated that he (Johnson) "had not been on the job very long and could not really make a fair assessment." (Docket No. 56-1 at p. 199.)

After receiving negative reviews, Bonewitz informed Johnson that he suspected HealthSpring was deliberately not looking for fraud as it related to member risk adjustment. On

---

comply with Local Rules. In addition, the statements of fact have improperly been used to interject opinions, hearsay, and conclusions of law. The court limits its discussion to the appropriate material facts.

[2] It is Bonewitz's belief that he completed the tasks he was given, but not at the Level III specialty.

August 6, 2012, Johnson, with the support of Human Resources Director Kila Sweeney, gave Bonewitz a Final Notice for continued poor performance, documenting that Johnson had met repeatedly with Bonewitz about his poor performance without any improvement.

On August 13, 2012, Bonewitz sent an email to Richard Appel, Director of Corporate Compliance at NewQuest, stating that he believed he had discovered evidence that (1) HealthSpring was incentivizing doctors to perform overly-thorough examinations and (2) HealthSpring was encouraging internal fraud in support of upward adjustments to risk adjustment scores. NewQuest has stated that "Healthspring does not incentivize the increase of risk adjustment scores." (Docket No. 56-9 at ¶ 10.) NewQuest has further stated that "HealthSpring does encourage doctors to conduct more comprehensive medical exams because the more time a doctor spends with a patient, the greater the likelihood that the diagnosis will be accurate. Early, accurate diagnoses have been shown to reduce healthcare costs by identifying conditions at a point at which they are more treatable using lower-cost solutions." (*Id*.) On August 14, 2012, Bonewitz complained to Human Resources that Johnson was attempting to coerce him into resigning his job.

NewQuest had "Electronic System Acceptable Usage and Workstation Use" policies which governed individual employees' use of their work computer systems and email accounts. Upon investigation, NewQuest discovered that: (1) Bonewitz sent non-work related information, identified as "IndyTrader.com User Profiles," from his work email account to a personal account, "peterjustin311@yahoo.com;" (2) Bonewitz sent data to "peterjustin311@yahoo.com" containing "TRR Data Mart" extract data, including what appeared to be a subset list of HealthSpring members, medical identification numbers, dates of birth and client names; (3) Bonewitz sent an email to an entity identified as "Immaculate-ds.com" which stated, "I received

3

your invoice and payment has been made" (this part of the chain was later forwarded from his personal account to his work account along with a "database backup"); (4) Bonewitz sent data from "peterjustin311@yahoo.com" to his work e-mail address containing information about a problem opening data, saying, "Can you give me some feedback ASAP as to what you found with the connectivity issues. I have to demo the cube this morning;" and (5) personal email communications of Bonewitz's wife were found on Bonewitz's email server; they appeared to have been intercepted by Bonewitz and stored for his personal use on NewQuest's server. NewQuest concluded that Bonewitz had been improperly outsourcing parts of his assignments, along with company data, to a third party. Bonewitz denied this and claimed he was merely asking a third party for input. Bonewitz claimed the other instances were either not prohibited or standard practice for someone who sometimes worked from home.

On August 31, 2012, Bonewitz wrote an email to Appel. Bonewitz explained to Appel that ZotecPartners, a separate company, was not providing patients a means by which to dispute billing charges. Bonewitz believed this was relevant to NewQuest because these patients were, in many cases, also HealthSpring's patients and Bonewitz did not want NewQuest to ignore its patients' problems. On September 12, 2012, Bonewitz provided Patricia Hoffman, NewQuest's Director of Compliance and HIPAA Privacy Officer, additional information regarding these concerns.

On September 26, 2012, David O'Brien of Crowell & Moring, NewQuest's outside legal counsel, met with Bonewitz. Bonewitz explained his belief that HealthSpring was too aggressive with its prescreenings. Bonewitz also repeated his concerns about ZotecPartners's failure to provide a mechanism to dispute billing charges. Also on September 26, 2012, John Bogan, NewQuest's in-house legal counsel, met with Bonewitz. The purpose of this meeting is disputed.

NewQuest maintains that the purpose of this meeting was to discuss Bonewitz's complaints about Johnson. Bonewitz claims he initiated the meeting by calling Bogan "regarding claims of fraud" and that Bogan flew in to meet him. According to Bonewitz, he explained his concerns of business fraud, including a timeline of whom he had spoken to and his views on how he was experiencing retaliation. Near the end of the meeting, the parties discussed Bonewitz's possible departure from NewQuest. Bonewitz maintains that Bogan asked him "for a number" and reminded him that he would have to release all legal claims. Two days later, Bogan called Bonewitz and asked for a number.

On October 8, 2012, in a 9:47 a.m. email, Bogan acknowledged that Bonewitz was making claims of "business fraud and employment retaliation" and indicated that Bogan wanted to "investigate and respond to [the] allegations properly." Bonewitz responded by explaining that he believed HealthSpring had its patients go through an overly-thorough initial medical examination with the goal of increasing the member's risk. Bonewitz communicated the belief that Healthspring had a fiduciary duty to explain the pros and cons of an extended exam to every patient. Bonewitz stressed that increased risks of fraud are prevalent with radiology (the business of ZotecPartners) in particular. In terms of the number that Bogan had requested, Bonewitz separately suggested $250,000 in exchange for leaving the company, representing twenty-four months of severance and benefits (rounded down). Bonewitz maintains that he stated that he would continue working.

On October 11, 2012, Bonewitz sent Bogan an email in which he alleged that he had extracted records of 100,000 patients from ZotecPartners and that many of those records were of HealthSpring patients. On October 12, 2012, Bonewitz contacted Bogan regarding (1) a news report that he had seen of what he described as a "bust" in Florida and (2) claims that he had been

5

accessing HealthSpring's databases.

On October 12, 2012, Bonewitz's access to the company's computers was cut off. The parties differ as to why. According to NewQuest, the decision was made to temporarily cut off Bonewitz's access to company computers and place him on suspension until a determination could be made whether any HealthSpring patient information had been compromised. According to Bonewitz, Bogan told him that the company did not want him running queries and uncovering whether HealthSpring providers were involved in the "bust," and NewQuest was going to remove his data access so that no further investigation would occur.

On October 15, 2012, NewQuest provided Bonewitz with a counteroffer in the form of an "Agreement and Release." Under the new severance offer, if Bonewitz would resign, he would receive a payment and his employment would end on October 31, 2012.[3] NewQuest maintains that it instructed Bonewitz to not return to work while the company evaluated whether the confidentiality of its patient information had been compromised. Bonewitz contends that, when he refused to sign the severance offer, NewQuest informed him, "Well, we are going to need to terminate you, then." (Docket No. 65-1 at ¶ 25.) Bonewitz states that he declined NewQuest's severance offer.

On October 26, 2012, Bogan sent Bonewitz a letter asking for an explanation of the issues concerning outsourcing his work assignments to third parties and rules for use of his corporate email account. Bonewitz did not respond. NewQuest then processed Bonewitz's "resignation"

---

[3] If Bonewitz filed for unemployment, NewQuest would state "the Company did not have work" for him.
6

effective October 31, 2012.[4]

On December 16, 2013, Bonewitz filed a complaint in the Circuit Court of Davidson County, Tennessee, against Healthspring, Inc. and Healthspring of Tennessee, Inc. (apparently under the belief that those entities had been his employers). (Docket No. 1-1.) The Complaint alleges (1) violation of the False Claims Act retaliation provision (31 U.S.C. § 3730(h)); (2) violation of Tennessee common law retaliatory discharge in violation of public policy; and (3) violation of T.C.A. § 50-1-304, retaliatory discharge in violation of the Tennessee Public Protection Act. On January 15, 2014, the defendants removed the action to this court (Docket No. 1) and filed an Answer (Docket No. 6). On April 29, 2014, the parties filed a joint motion to substitute NewQuest as defendant and file an amended answer to reflect the change (Docket No. 13), which the court granted (Docket No. 15.)

On October 14, 2014, Bonewitz, although represented by counsel, filed a *pro se* and unsigned Motion to File an Amended Complaint. (Docket No. 22.) Shortly thereafter, Bonewitz filed a Motion for Substitution of Counsel, seeking to discharge his counsel and represent himself *pro se*. (Docket No. 24.) Plaintiff's counsel also filed a formal Motion to Withdraw. (Docket No. 29.) Bonewitz also filed a new proposed case management order that requested changing nearly all of the remaining dates of importance in the case (Docket No. 28) and a Motion for a

---

[4] Bonewitz subsequently received a Separation Notice on December 16, 2012, which stated "HealthSpring Acquisition 12/16/12" as the reason for the separation. NewQuest has adduced evidence that this December 2012 Separation Notice was an administrative error that resulted from the integration of a payroll system requiring the offering of jobs to all current NewQuest employees. Upon discovering that Bonewitz was incorrectly listed as a current employee, the December 16, 2012 *pro forma* offer was immediately rescinded. Aside from disagreeing with them, Bonewitz has not adduced evidence to create a dispute of fact as to NewQuest's version of these events.

7

Court Hearing (Docket No. 27). The court referred these matters to the Magistrate Judge. (Docket No. 47.) The Magistrate Judge held a hearing on these various matter on January 12, 2015. (Docket No. 55.) At the hearing, Bonewitz appeared with new counsel, who advised that he had just been engaged and filed a notice of appearance. (*Id*.) The Magistrate Judge denied Bonewitz's request to file an Amended Complaint. (*Id*.) Furthermore, the Magistrate Judge required that the parties adhere to the existing case management order for the timetable for dispositive motion practice. (*Id*.)

On January 15, 2015, NewQuest filed the pending Motion for Summary Judgment. (Docket No. 56.) On February 11, 2015, Bonewitz filed a Response opposing NewQuest's motion as to all claims. (Docket No. 65.) On March 13, 2015, NewQuest filed a Reply. (Docket No. 70.)

## **ANALYSIS**

### I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus.*

8

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     False Claims Act Retaliation Claim

The False Claims Act ("FCA") imposes civil liability for knowingly presenting, or causing to be presented, false or fraudulent claims to the United States government for payment or approval.[5] 31 U.S.C. § 3729(a)(1)(A). A fraudulent claim against the United States "is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Sanderson v. HCA*, 447 F.3d 873, 878 (6th Cir. 2006). The FCA applies to claims submitted by healthcare providers to the government; "indeed, one of its primary uses has been to combat fraud in the health care field." *U.S. ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 731 (M.D. Tenn. 2013) (citing *U.S. ex rel. Chesbrough v. VPA P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)). Those who violate the FCA are liable for civil penalties and treble damages. To promote enforcement of the FCA, private individuals can bring claims against organizations that they allege have committed fraud on the government. 31 U.S.C. §§ 3729-33. The FCA contains whistleblower protections for employees

---

[5] The FCA also imposes liability for knowingly making or using a false record or statement that is material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

9

who make such claims. 31 U.S.C. § 3730(h). Section 3730(h) protects an employee from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" by an employer because the employee investigated, reported, or sought to stop an employer from engaging in practices which defraud the United States government. *See* 31 U.S.C. § 3730(h)(1).

A claim under 31 U.S.C. § 3730(h) requires proof (1) that the plaintiff was engaged in a "protected activity"; (2) that his employer knew that he engaged in protected activity; and (3) that his employer discharged or otherwise discriminated against the employee as a result of the protected activity.[6] *Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). The protected activity must relate to "exposing fraud" against the government or "involvement with a false claims disclosure" to the government. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000). "In order to defeat summary judgment, [Bonewitz] must therefore raise a genuine issue of material fact that []he engaged in protected activity, defined as that activity which reasonably could lead to a *viable FCA action*." *Id.* (emphasis added)

"[G]rumbling to an employer about job dissatisfaction or regulatory violations" does not constitute protected activity, nor does it put an employer on notice that an employee is raising an issue that could be the subject of a viable FCA claim." *U.S. ex rel. Yesudian v. Howard*

---

[6] The *McDonnell-Douglas* burden-shifting framework is applicable in analyzing FCA retaliation claims. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). Therefore, Bonewitz must first set forth a *prima facie* case of retaliation. The burden then shifts to NewQuest to articulate a legitimate, non-retaliatory reason for the adverse employment action. Then, if the employer produces evidence of a legitimate non-retaliatory reason, Bonewitz must assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation.

*University,* 153 F.3d 731, 743 (D.C. Cir. 1998). An employee "*must* allege fraud on the government" to constitute protected activity. *McKenzie*, 219 F.3d at 516 (emphasis added) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)). An employee "need not use formal words of 'illegality' or 'fraud' . . . but must sufficiently allege protected activity with a nexus to a *qui tam* action, or fraud against the United States government." *Id.*; *see also Gynn v. EDO Corp.*, 710 F.3d 209, 216 (4th Cir. 2013) (holding that even complaints which trigger government investigations may not constitute protected activity and that "there must be a distinct possibility that the investigation the employee triggers with his disclosure will lead to a viable FCA action").

In 2009, Congress amended Section 3720(h)(1) to make it clear that the law can protect employees from being fired not just for taking actions in furtherance of an FCA action, but also for undertaking "other efforts to stop" violations of the FCA, such as reporting suspicious conduct to internal supervisors. *Halasa v. ITT Educational Services, Inc*., 690 F.3d 844, 847-48 (7th Cir. 2012); *Tibor v. Michigan Orthopaedic Institute*, No. 14-10920, 2014 WL 6871320, at *11 (E.D. Mich. Dec. 5, 2014). However, the amended language does not eliminate the clear requirement, embodied in *McKenzie*, that the protected activity reasonably lead to a viable FCA claim. Accordingly, "the internal reporting of wrongdoing . . . must establish some nexus to the FCA . . . by reasonably leading to a viable FCA action." *Id.* at 517 (collecting cases). If a plaintiff's allegations fall short of reaching a nexus with a viable FCA action, therefore, he has not, as a matter of law, engaged in protected activity. *See, e.g., Hopper*, 91 F.3d at 1269 (employee who wrote seventy letters and made fifty phone calls to force school district to comply with federal and California regulations was not engaged in furthering an action under the FCA

11

and, thus, not engaged in a protected activity). In common parlance, therefore, an employee who complains about internal wrongdoing that could reasonably be a violation of the FCA and could lead to a viable FCA action may have engaged in protected activity. On the other hand, an employee who has complained of wrongdoing that cannot be an FCA violation or has no nexus to a viable FCA action has not engaged in a protected activity.

Under this rubric, Bonewitz fails to establish that he was engaged in protected activity. Foremost, Bonewitz *never* raised any concern (internally or externally) regarding the submission of actual false claims to the United States by NewQuest – the basic element of any viable FCA action. Bonewitz never complained to anyone at NewQuest (or elsewhere) that any false claims were being generated and submitted by NewQuest or paid to NewQuest by the government. Because Bonewitz had no complaints regarding actual false claims, he had no actual or potential *viable* FCA action.[7] Bonewitz, therefore, was not engaged in protected activity.[8]

Moreover, Bonewitz's concerns were fundamentally that – general concerns – rather than specific complaints. Bonewitz had general concerns about the regulatory compliance processes

---

[7] The fact that Bonewitz shared his general concerns with a NewQuest attorney from Crowell & Moring, with NewQuest in-house counsel Bogan, or with NewQuest Human Resources makes no difference in determining whether there was a viable FCA action such that Bonewitz could have engaged in protected activity. In his brief, Bonewitz is of the opinion that, if he spoke with a NewQuest attorney from Crowell & Moring (whom Bonewitz self-servingly refers to as "*Qui Tam* counsel"), then he necessarily had a viable FCA claim. This does not follow. What matters is not with whom Bonewitz spoke, but the content of the conversation. As discussed herein, Bonewitz had no complaints regarding actual false claims, the *sine qua non* of a viable FCA action.

[8] While Bonewitz asked Hoffman if NewQuest was willing to turn data over to a neutral source such as the United States for evaluation, such request was not accompanied by any threat of a *qui tam* action, nor was it accompanied by evidence of any false claim being submitted to the government. This request for an independent evaluation does not create the necessary nexus to a viable FCA action.

at NewQuest and ZotecPartners (*e.g.*, that patients (especially radiology) were coded as requiring too much care; that there were no internal processes to appeal billing charges) that he chose to raise through the company's internal reporting chain. Bonewitz has not established any nexus between those concerns and any viable FCA action (hypothetical or actual). Bonewitz never presented NewQuest with any evidence of the generation or presentment of false claims (or even of a specific scheme to defraud the government). Moreover, Bonewitz's special concerns about purported intensive radiology coding were even further removed from the actual government claims submission process.[9] Finally, several of Bonewitz's concerns appear to have been about the general integrity of NewQuest's business, rather than about involvement with the federal government at all. For example, Bonewitz was concerned that NewQuest (1) should be explaining the "pros and cons" of detailed examinations to patients out of a fiduciary duty, (2) not ignoring its patients' problems with other companies, (3) trying to reduce general business waste and fraud, and (4) ensuring that its business partners acted like better corporate citizens. While admirable, none of these concerns had anything to do with protected activities or the FCA.[10]

Finally, the court notes that Bonewitz often conflates his complaints against NewQuest with his complaints against ZotecPartners (an entity not party to this action). Put simply,

---

[9] Radiology diagnostic codes (the business of ZotecPartners that Bonewitz believed was somehow nefariously connected to NewQuest) are not even considered by Medicare when it calculates risk scores. *See* CMS Regional Technical Assistance Participant Guide, p. 2-6. This fact, adduced by NewQuest, has not been contradicted by Bonewitz.

[10] Bonewitz's reliance upon *Tibor* is misplaced. In *Tibor*, the court merely found that a plaintiff had sufficiently alleged, at the motion to dismiss stage, that she engaged in protected activity. The court noted that arguments concerning whether the plaintiff's actions could constitute actually protected activity were appropriate for summary judgment. *See Tibor*, 2014 WL 6871320, at *13 n.4

Bonewitz's complaints about whether ZotecPartners had adequate systems in place to service its patients might be relevant to whether Bonewitz engaged in protected activity *vis a vis* ZotecPartners, but there is no evidence that it raises any potentially viable FCA claim against NewQuest. Stated differently, informing NewQuest that ZotecPartners may be committing some independent fraud is not a protected activity *vis a vis* NewQuest.

In short, Bonewitz's claim is improperly grounded in NewQuest's (and ZotecPartners') internal processes, not the submission of false claims for payment to the United States. It is clear that Bonewitz was dissatisfied with how NewQuest did business. It is more than clear that Bonewitz did not care for how ZotecPartners did business. Perhaps the combination of the two, however tangential, proved irresistible to an individual concerned about corporate compliance. However, Bonewitz had no actual evidence (or close to evidence) of false claims presented by NewQuest to the government. Bonewitz therefore was not able to engage in protected activity at NewQuest by complaining of FCA violations or of issues that were of a close nexus to forming the basis for an FCA complaint.

Accordingly, Bonewitz is not entitled to protected activity status under § 3730(h)(1). Because Bonewitz was not engaged in protected activity, he cannot make a *prima facie* case for retaliation, and the court's analysis ends. NewQuest is therefore entitled to summary judgment on the FCA retaliation claim.

### III.  State Law Claims

Having dismissed the federal law claim in this case, the court declines to exercise supplemental jurisdiction over the remaining state law claims.

### CONCLUSION

For these reasons, the defendant's Motion for Summary Judgment will be granted.

An appropriate order will enter.

                                                ALETA A. TRAUGER
                                                United States District Judge